We'll hear from Mr. Revol. May it please the Court and Counsel. This is a case about six years of treatment, compressed into 12 days. It's a case about a young woman who dealt with a long history of sexual abuse, eating disorders, and suicide attempts, and how Humana paid for 12 days of partial hospitalization treatment and then denied that it was not medically necessary to pay for any more treatment beyond that time period. Now, because of this Court's landmark opinion just about two years ago in Ariana M. v. Humana, this case is a blank slate. So no decisions by the magistrate court matter, no decisions by the district court matter, no decisions by Humana matter. Your duty is to review all of the available evidence and assess its weight and credibility. And there's a lot of evidence to review. There are the medical records from the treating center, Oliver Pied in Miami. There is the information from Catherine's medical providers. There's the information from Humana's medical record reviews that they paid for. And then there's the plan. And all that information together is going to lead us to resolving one issue today, which is, is Catherine entitled to benefits under the plan? Or put another way, was it medically necessary for her to continue getting partial hospitalization treatment after day 12? So it was 12 days versus what's the extra time? The total was 90 days. There were 77 days originally not paid for. Humana mistakenly paid for some of them under a billing issue. But essentially the issue is whether or not it was medically necessary for the final 77 days. You correctly noted that it's, as you said, a blank slate or de novo review standard. Both sides filed summary judgment. Both sides saying they're entitled to judgment as a matter of law. I wonder if that's the right procedure for a de novo review like this. There's a recent opinion by Judge O'Connor in the Northern District of Texas where he says given, if it's de novo review, he denied summary judgment and then just said, I'm just going to conduct an independent review on my own. He didn't have to have a trial because we're limited to the record, the administrative record. So he didn't have to go into court and have a trial, but he just engaged in an independent review and made a ruling. How does the summary judgment posture, which you both are invoking, fit this type of review that's de novo? I don't think it changes anything, Your Honor. There are courts in other circuits that go through the Rule 52 motions and use that instead in the equivalent of a bench trial, and then they go through their findings of fact and conclusions of law. But regardless, de novo review means that the factual conclusions and the legal conclusions are being reviewed de novo by the court. But I take de novo review to mean we look at this from scratch, as you said, and then we can just say we think the best evidence is on your side or their side. And how does that interact with a fact dispute that sort of is the governing principle of summary judgment? Well, that becomes the fact finder's decision. And so it becomes this court's ruling on how to rule on that fact. In other words, if we think there's a fact dispute, but we say, you know what, we think the better evidence is on this side versus this side, we can do that. Correct, Your Honor. There are district courts in the last two years, particularly the Eastern District, Pike v. Unum, where Judge Mazant made factual decisions and legal conclusions based on this new de novo review in our circuit. So it is entirely based on the evidence available to the fact finder at this point. So our job is sort of forgetting the normal summary judgment. It's just to decide who presents the better evidence. Correct. And I would even put it a slightly different way, coming from the civil side. De novo review, I would say, is just a greater weight of the evidence. And so it doesn't mean who has more medical reviews. It's who is more believable, what evidence is more credible. And in looking at that, you have the entire administrative record. And whatever you determine is persuasive in that record. And in looking at that record, that takes me to my next point, which is the court is well aware of Catherine's health history, so I won't go into that in much detail. But I do want to turn to what the court needs to look at in terms of finding whether or not this medical treatment was medically necessary. Now, the first is the plan terms, because under ERISA, we always start with the plan. And the terms of the plan can be found at the record on appeal 312. There are four terms of the plan that are important to review in terms of medical necessity, because medical necessity is defined in the plan. And unfortunately, neither the magistrate judge nor the district judge actually reviewed the plan terms and analyzed them in terms of medical necessity. They went on to other guidelines. But I would submit that under de novo review, you can look at the plan terms and decide this case simply on that. The first factor is, is the medical treatment in accordance with national standards of medical practice? And we know that it was, because Humana paid for the first 12 days. So there's no question that this particular medical provider followed national standards of medical practice. The second standard, or the second requirement under the plan is that the treatment is appropriate in type, frequency, site, duration, and is considered effective for the patient's condition. And that's where we have to look at the patient's condition in two snapshots, essentially. Number one is, how did she present on day one? And number two is, how did she present on day 12, when Humana decided that she had somehow improved so that she didn't need to stay for partial hospitalization treatment? We know, because it's in the record, that her behavior got worse despite previous outpatient treatment. She tried all kinds of other treatment in the years up to this time period, and it didn't work. We also know that as of June 12, June 11, 2012, on day 12 of her stay at this facility, she still had urges to restrict her food. She still cried at her meals. She still ate all her meals. And she still needed staff support to finish all her meals. And that's another thing that's important, because the parties don't dispute a couple of fundamental facts. Number one, she was medically stable for days one through 12. Number two, she was eating all of her meals from days one through 12. Number three, she was not purging from days one through 12. And number four, she had a support system from days one through 12. And so the real question that arises here, and is one to ask Humana, because it's a consistent question, is, how did Catherine improve from day one, when treatment was covered, to day 12, when she was medically stable, eating all her meals, not purging, and had a support system? And the answer comes in, what were her urges? Because it is not enough if her behaviors were being controlled in a structured environment. If she left that structured environment, her behaviors would have returned. And so what we see is that we had, during the time period beyond day 12. So you're saying, because I thought your argument was she hadn't improved. But Humana points to a lot of evidence that you just cited, that she was eating a lot more, that her situation had improved. So if you're arguing, I mean, someone improves, they get hospitalization, they improve. I mean, the whole idea is to get them back at some point out of the hospital. I mean, if your argument is because of the improvement, you can't let them out, when would that time come? Well, that's the thing, Your Honor, we're not saying she improved. She was consistent between days one and 12. And improving. Well, she improved versus what the situation was. Wasn't she at like 600 calories a day before she went in? That was before she went in. And then in the structure of partial hospitalization, I think they had her up to something like 1,200 calories a day. And that was in day one through 12. We also know that her weight was the same from day one to day 12. So her weight didn't go up or go down. It didn't fluctuate very much. But what we're getting at is that this was... So to ask my question another way, what would need to be shown for the hospitalization to end in your view? I think you'd have to have some kind of evidence from her providers and from her that her urges were under control. It's not enough for them to say, look, we locked the bathroom so you can't go somewhere to vomit. It has to be her urges to purge herself had reduced. She had a healthy way of dealing with that kind of behavior. She had some kind of way to minimize those urges. If those urges were still present at all time, keep in mind that partial hospitalization is five days a week, eight hours a day. And what Humana's reviewers said was that she could step down. One reviewer said she could step down to two days a week, half days. And another reviewer said she could step down to one hour, one day a week. So is there a fact dispute on this weight issue? No, there's not, Your Honor. Because I think I heard you just say that her weight was unchanged from day one to day 12. That's correct. I thought there was also testimony or evidence that it went from 80 percent upon entry to 95 percent as of June 11th. I think the question becomes about a percentage of healthy body weight. And so one of the requirements of one of the other criteria is, is she at beyond 80 percent of her healthy body weight? We can dispute what the target should be to trigger that there be no longer any need for further weight. But I think you were saying that there was no improvement at all. 80 percent to 95 percent sounds like it's at least in the right direction, if not completed. Well, Your Honor, what I'm saying is her weight was the same. It was 125 pounds on day one. It was 125 pounds on day 12. Her weight did not change in that time period. So where do these percentages reflect, then? The percentages come from different criteria. One comes from the American Psychiatric Association guidelines, and another comes from the Mahalik criteria, which you may have used. So they define, as I understand it, healthy weight differently. And so their percentages... I don't believe they are, Your Honor. But what we do know is her weight was the same day one through 12. So again, we can look at the plan terms, number one, in determining medical necessity, and the four factors there. If the court wants to go beyond those, there are the American Psychiatric Association guidelines. And let me start with that, because this was part of the discussion in Ariana M. versus Humana. In that case, and Humana will tell you this here, too, look, why should we use the APA guidelines? Well, in the Ariana M. case, they were not part of the administrative record. And the fight we had there was to try to get the court to review documents outside the record. That's not the case here. In this case, at least two of Humana's medical record reviewers claimed to have used the APA guidelines. Oliver Pyatt, the medical provider in this case, reviewed the medical guidelines. We provided the APA guidelines in the appeal, and it's part of the administrative record. It can be found at HP 1569 to 1571. It's the best way to look at it. It's a three-page summary flow chart. And it's got nine factors to deal with that are specific to eating disorders. It's the largest psychiatric association in the world, and these guidelines can be used by this court in determining medical necessity. They're not, like I said, nine factors. The other courts below did not review these factors or consider them. And Humana did not either in its analysis of denying claims. The only time it was... Yes, Your Honor, they used the Mihalik guidelines. Is your point that that's incorrect, those are not the right guidelines, or that she did not satisfy those guidelines? A couple of things, Your Honor. Number one, we don't believe they're appropriate guidelines because they're not listed in the plan. They weren't provided in this case, the full set of guidelines. And they are for-profit guidelines created by a private company. We've made the same argument in Arianna M. and Humana will certainly tell you that those guidelines were ultimately approved by the other courts. But my argument here is that because there are other guidelines in this case, you do not need to rely on the same Mihalik criteria. If we apply Mihalik, though, what it's number three and number four at issue, on number four it seems like the key is whether there were alternatives that could have also, you know, helped her, and the court below concluded that intensive outpatient care could have been that alternative, which she went through in 2010 apparently successfully. So why don't you respond to that? Yes, Your Honor, those two specific Mihalik criteria are the issue. And I would focus the court on a specific word. It talks about controlling eating, purging, and compulsive exercise behaviors. And behaviors is the word I would focus on. Because the way I believe Humana is interpreting that and the reviewers are saying, well, if you're not doing it, then it's not a behavior. It's not dealing with the urges which the record shows were ongoing. And the urges were only being controlled by the structure of partial hospitalization. Without that structure, she would have returned to these behaviors. And unfortunately, Humana's reviewers didn't really analyze how she would have dealt outside of the structure of partial hospitalization. So that final factor which talks about the structure partial hospitalization can provide can reduce these behaviors. I would argue doesn't just deal with the act or the behavior itself, it also deals with the urges that she was undergoing at that time period. Normal people don't have those urges. And it was necessary for the structure of this kind of program to help reduce those behaviors. And that's what the final factor of Mihalik actually deals with. Isn't the length of time that she is hospitalized, what does the record show about the relationship between the length of time and how much time is required in order to actually make purchases? What are the permanent changes in her behavior? To answer that, Your Honor, historically we can see she was ping-ponging back and forth, and her previous days weren't enough. In this case, we can see that there are certain treatments, certain evidence that she underwent, talking about her health condition, her low blood sugar, her tachycardia, and other abnormal lab results which were ongoing in June, July, and even into August. So in that 77-day portion where she was improving, some can say, but she was still needing that structure of partial hospitalization. Another way to think of it is there were good days and there were bad days. And there were times where she was able to start improving, and then she would have a relapse. Your point, though, is her behavior improved, but her, I'm sorry, behavior by, if you define it as what she's actually doing. But we should include in the word behavior the concept of urges as well. Correct, Your Honor. It seems a bit atextual, doesn't it? Those two things seem to be different. One is what you're doing, one is what you're feeling. Well, Your Honor, I think the word behavior in this context is a medical term of art, and so I don't think behavior deals just with the act itself. Like I said, the record evidence talks about her still having a desire to purge and couldn't do it because the bathrooms were monitored, crying during her meals, and so forth. So I think there's evidence that supports the ongoing urges. All right, you say five minutes for rebuttal. We'll now hear from Mr. Soltero. May it please the Court, Counsel, Carlos Soltero for Humana. There's no question that Catherine P. is a young lady who's had a very challenged and difficult background. The only issue really before the Court is whether on June 12, 2012, whether her condition was made that level of treatment medically necessary at the Oliver Pyatt facility in Miami, Florida for this Austin area resident. Three different doctors from three different entities conducted an extensive review, all of which is in the record. And they all concluded, all three psychiatrists, as did the magistrate judge and the district court judge, that it was not medically necessary under the terms of the plan and under the MAHOLIC criteria, which this Court, including the panel that heard Arianna M. the first time at 854 F. 3rd, concluded that the MAHOLIC plan is consistent with national standards. In fact, went into such detail that they compared the language of medical necessity, there's a chart, and compared it to the MAHOLIC criteria and said that that was a reasonable approach, appropriate to use, and consistent with national standards. The three issues that the appellant raises are, one, really I think the only issue before the Court, whether it was medically necessary under this de novo review, second, the treating physician rule, and third, the alleged improper bias issue. Counsel did not spend a lot of time on either of the last two points, and it's understandable, because authority from this Court, from courts in this circuit, and even from the Supreme Court are very clear that the treating physician rule has no place in an ERISA determination. What do you make of counsel's point that this case failed or satisfied, whatever the right term is, the MAHOLIC, because of this urges theory? Well, Your Honor, as I mentioned, obviously we disagree, and the reasons are, as the three reviewers pointed out in their detailed review and conclusions as to why it failed the MAHOLIC criteria, they actually go down and analyze the various points in the record. That's located at 1850, 2697 through 2699, and then also Dr. Marks' review. I don't have the record site for that one, but under the review by those three physicians applying the MAHOLIC criteria, they concluded that her condition did not meet the level of medical necessity. And one of the things that's both in the plan and in MAHOLIC... Can we talk about this EDPM 4, 2, and 3, because that's what he's, I think, what your friend on the other side is focusing on? Yes, Your Honor. They're saying that she met this criteria because you have to read behaviors to include urges. So I'm wondering what your response is to that. Well, part of our response to that is, as the reviewers concluded, she was medically stable. She was not homicidal, suicidal, or hallucinating in any way. She was not aggressive or threatening, not restricting her... There's no evidence to support that. And there's not even any opinion from her doctor saying that it is required, mandatory, that she must do this. There's no evidence saying that she could not have... She has a lifelong condition that's going to be managed in different settings and has been. And certainly there are different lower standards that could be appropriate once somebody is not in an acute critical phase. But just in a managed phase. And you can always say that they're only doing well because they're in partial hospitalization or even full residential treatment. Then that would be the argument for keeping them in perpetuity. There's nothing in the record that specifically supports that contention. That she was only restricting and had these behaviors because she was in a treatment facility as opposed to receiving medical care. Supervisory care, which could have been accomplished at intensive outpatient therapy, as suggested. You're accepting their contention that as a medical term of art, behaviors would include urges. Your point is just that they have no evidence of either problem. I would say that it might be fine to consider that. That's what the physicians are supposed to do, is consider everything appropriate within the criteria. Behaviors and what's leading them would certainly, I would think, be part of that. And part of what the reviewers considered. It's part of the Mahalik analysis. What role does, from a legal standpoint, does her judgment about what she needs to make this thing stick to work when she leaves the facility? What role does the patient's judgment have in the legal determination? I think certainly what she is communicating to her providers at the time, and or anything that she was wanting to communicate to the reviewers, would be an important input for any reviewer to consider. I would think so. Here she is in this inpatient facility. Not very many people want to stay in an inpatient facility. But she apparently made the judgment that she needed to stay there until August. So I'm curious about, from a legal standpoint, what does the patient's own judgment about what she needs to make, what she had to do was to make this thing stick past when she was hospitalized. What does her judgment about that? Do courts ever talk about that? Maybe not. I'm not aware of courts discussing that in great detail or certainly any of the cases that we've briefed. Obviously the first step we look at in analyzing this is what does the contract provide for and what is medically necessary. Certainly a patient's opinion might have some relevance to determination of medical necessity. But at the end of the day, that's a physician decision of what's medically necessary, as opposed to, as the contract says, desired or requested treatment. Certainly with these kinds of medical conditions, the patient's participation and buy-in and following through is very important. And I think that's what the record was reflecting, that she was no longer restricting her eating and purging. She had a viable support system. She didn't have the imminent dangers that are looked for of being homicidal, suicidal, hallucination, showing some level of requiring a stepped-up level of treatment. And that's, I think, largely why the reviewers came to the conclusion that given her then-existing condition, it was reasonable and she could be treated at a lower level of care, such as intensive outpatient. Which was a very similar situation to the Ariana M case. This case is, while each person is individual and the facts are different and the time periods are different, legally those two cases are indistinguishable. One thing I also would note about their contention on bias, because this goes to, well, whose decision should a judge, whether in a Rule 52, a summary judgment proceeding, whatever the right procedure is, how does the district judge initially and the three of you come to a decision? It is a very unusual process for how we handle most of our cases. We, of course, move for summary judgment because that's a standard procedure available. The judges, I think, have to look at the record evidence carefully and just make a determination based on what is most persuasive. This is not a no-evidence standard. It is a weighing of the evidence and determining what is appropriate. One thing I would note is, regarding specifically to the issue of bias, they say, well, you shouldn't listen to the three reviewers because they're paid for through their contracting with Humana. As the Ariana M opinion, the Judge Rosenthal wrote, the case law actually says that that's a step that shows a reduction in bias in the context where bias matters, which would be abuse of discretion. Our position is, and I think counsel for both Catherine P. and Ariana M argued on Bonk, that bias matters. That's not relevant, and they're correct in that. Well, the administrators, any conflict the administrator has shouldn't be relevant because there's no deference given to the administrator. But an individual doctor, as you say, it's just essentially looking at the record cold and deciding who has the better case. You can always, in a trial or anything else, consider a witness's bias. That's always the rule. So maybe your doctors have some bias because they want to keep Humana business. Maybe the doctors they're relying on, the treating physicians, have bias because, as the Supreme Court said, treating physicians can make more money if the people stay in the hospital. It seems to me you can always look at a witness's bias or anything that goes to their credibility. Yes, Your Honor. And I think you've highlighted the two that are most assailantly argued. And the reason I raise it is because they raised it in their brief to this Court as one of the points of error and contention. And we think that because the treating physician rule doesn't apply, it should be no weight given to those issues. Really, the answer is, is it right or wrong? And based on, again, if Dr. and I sometimes mispronounce his name, but Dr. Bochkovich, it was with LifeSync, and he found in its record on appeal 1847 through 1850, that as of the snapshot in time that you look at, she had no symptoms that required the level of EDPM3 or EDPM4 of the Mahalik criteria, as Judge Ho was asking about. She was medically stable, which is super critical. She was eating 100 percent of her meals, not restricting, not purging. And that leads to the conclusion, based on the facts presented by the record of the treatment at Oliver Pyatt, that she could be treated at a lower standard of care, at a lower intensity of care, such as intensive outpatient. And by the way, there's a whole range of potential options. There's, of course, like suicide watch at one extreme, no treatment at all at another extreme. And there's permanent resident hospitalization. There's temporary. And then we're talking about the difference between intensive outpatient and partial hospitalization. So they're sort of in the middle. Similarly, the next reviewer from Advanced Medical Review... I'm sorry. That's my understanding, Your Honor, that she had gone to Florida, was staying somewhere, and then was going for the treatment for a long period of time during the day. And then finally... Judge, I tried to look for that when I heard the question and answer session just now. I don't have a direct answer for you as to... Clearly her weight went up during the stay. And I have no record site at this point to contradict that. And if I do, we'll send a supplement to the panel. But at this point, I'm not in a position to contradict that statement based on the record. I will say, though, that the issue isn't just her weight. It's the intake. And it's the purging. And so it's not just the flat weight at any point in time. It's... It's not clear from the pre-authorization review that the weight issue was a factor in making the determination. It could have been that other aspects were the reason that it was pre-authorized. Because at the end of the day, the question isn't sort of what doctors do or what person may choose as their own, but rather what's covered under the plan. And so applying the Mihalik criteria, it was appropriate for the pre-authorization for 12 days. When it was reviewed again, it was no longer necessary at that level of care. Which is similar to the Arianna M. situation. The claim request, the pre-authorization did not meet that level of continued treatment. Does the record develop at all this question about how her changing her attitude... Let's see. How that changed during the course of her hospitalization. I mean, what you're talking about here is trying to change a lifetime, apparently. And she's got to make a mental change in order to make this thing last, to make it stick. And obviously her decision was, I need to stay here longer to make this thing work. Does the record talk about that at all? I don't think the record talks about specifically why she chose to stay there beyond... Why she chose to stay beyond the period that was pre-authorized. I think the record, as summarized by the reviewers, does discuss her progress during that time. Or her conditions for that window of time. What happened after the fact is to some extent... Not really relevant as to the determination of whether it was medically necessary at the time or not. I mean, doctors, treating physicians, talk to the patient that they're going to incorporate what the patient's telling them as part of their review process. Especially with psychological type, as opposed to physical ailments. And, Judge, that's one of the primary ways that doctors do communicate with their patient about how their well-being is progressing. And that's why those entries in the record showing the improvement... Supported the determination that that level of treatment was not... Would not be medically necessary under the plan. The other thing I would note on this record comparing to Ariana M that I think is also of interest is the notion of the bias issue. With regards to one of the reviewers, Dr. Acenas, was not only a reviewer in this case, but you can see from the opinion, the published opinion, that she was a reviewer in the Ariana M case. In that case, I think this is notable, she made a determination that the initial determination that continued treatment was not medically necessary. She reversed that as an appeal and additional treatment continued as part of that plan. In this case, she was the reviewer of the appeal and concluded that it wasn't medically necessary. Again, so this notion that the reviewers are always going to be favoring one side or the other is not well taken, particularly in this case, where you have the same reviewer who is clearly willing to change the determination if it's inappropriate. And in this case, found that it was appropriate, as did the district court and the magistrate judge. So unless the panel has additional questions, I would yield the balance of the time. All right, thank you, sir. I want to start by just trying to find some specific citations for some of the questions you had. One of the questions was, what was her condition on day 12 when Humana denied treatment? And page 12 of our reply brief has a number of record on appeal citations. And it says she continued to have urges to restrict and purge, had low blood sugar, a fast heart rate. Her weight remained low and was essentially the same as admission. Her anxiety and stress had increased. And then, as I said earlier, she was able to eat her meals and not purge only because she was being monitored. And there are a number of record citations there. In addition, I think another question was asked about oh, there was another issue, I think, that Humana's lawyer was discussing just now about whether or not she improved. And there are three circuits that have weighed in on this idea of improvement. The Third Circuit, the Eighth Circuit, and the Ninth Circuit. And the citations come from our brief, our reply brief, sorry, our opening brief, pages 23 and 24. The McOsker opinion out of the Eighth Circuit, the Miller opinion out of the Third Circuit, and the Montour versus Hartford opinion out of the Ninth Circuit. And each of them talk about the idea that you would expect, it is not in and of itself outcome determinative, but you would expect if something is being, if a claim is being denied at some point later, you would expect there to have been some improvement. We haven't found any improvement in the record here. In fact, we found, as some of the citations I was just pointing out, her anxiety and stress were increasing. So without some proof of improvement, there is no rational justification for why the claim suddenly should have been denied. I want to also turn to the issue of the medical record reviewers. And the issue is a simple one. It's bias and credibility. Bias and credibility is an issue in every case, and that doesn't go away in de novo review. It's even an issue under the abusive discretion standard, and that's why limited discovery is allowed under the financial conflict of interest of the insurance company and their medical reviewers. In this case, we got discovery that found out that these medical reviewers were paid on a flat fee rate, and so they were incentivized to do fast reviews, but not accurate reviews. And that evidence came out. And so we're not asking for a treating physician standard. We're not automatically saying, automatically believe the treating physicians more than anyone else. But the facts in this case show that the three physicians each made significant mistakes. The first was Dr. Michael Bojkovic. He, as the record shows, never talked to Catherine's medical providers. We don't have his CV, so all we know is he's a psychiatrist. We don't know if he's experienced in treating eating disorders. But he did his review very quickly without talking to her doctors, and we don't know his credentials. Dr. Kenneth Marks was the second reviewer. We also don't have his credentials. We just know that he's a psychiatrist. We know what his rate was for the flat fee he was paid. And we also know he didn't talk to Catherine's doctors either. We also know that he got the history of Catherine's medical condition wrong, because he said she had no history of sexual abuse. And that was previously discussed by the magistrate court in its opinion as well. And finally, Dr. Maria Antoinette Asinas was the final reviewer, who claimed to have reviewed more than 1,000 pages of documents, including the APA guidelines. And she was paid a flat fee for that review. She also didn't provide her CV, so we don't know what it is. And, you know, there was a discussion Humana's lawyer just made saying, look, Dr. Asinas was in the Arion M case. She approved a couple of days, so she's not automatically biased. No, we're not saying that. We're not saying that these doctors are automatically biased. We're saying garbage in, garbage out. And when you are not provided a full picture of what is going on on day 12, or days 1 through 12, and you're given limited information, and you're given limited money to do a limited review, you're going to come out with a limited review, and it's not going to be as good as the treating physicians. So if it's inaccurate, if it misses details, and if it's incorrect in any way, you are entitled to give that less weight. It's not an automatic standard, but it's a bias and credibility standard under this de novo review situation that we're in. And finally, I would say that there is evidence that Catherine did eventually approve. So the question is not, was it medically necessary on day 13, or day 90, or day 77. She did improve over time. Like I said, there were good days and bad. The record citations for that are on page 23 of our opening brief. And finally, I would just say that there are certain things that are not disputed in this case. Her weight. There are other things that are not disputed. And what she said, and what her mom said, that 12 days was not enough to treat these six years. And so under de novo review, this court is in the fact finder position to determine that this treatment was medically necessary. Thank you for your time.